UNITED STATES of America,

v.

Glen NORRIS, Defendant.

No. 99–CR–705 (JBW).

United States District Court,
E.D. New York.

Aug. 13, 2003.

Lawrence Gerzog, New York City, Mildred M. Whalen, Brooklyn, NY, for Defendant.

Nikki Kowalski, Brooklyn, NY, for Plaintiff.

## MEMORANDUM & ORDER

WEINSTEIN, Senior District Judge.

### I. *Introduction*

Following a guilty plea, the district court sentenced defendant Glen Norris to 120 months' incarceration for conspiring to distribute five or more kilograms of cocaine. *See United States v. Norris,* 143 F.Supp.2d 243 (E.D.N.Y.2001) (*"Norris I"*). The court refused to consider three sentencing enhancements sought by the government based on its finding that *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), prohibited sentencing enhancements that were not charged in the indictment and supported by a factual finding by a jury beyond a reasonable doubt. The Court of Appeals for the Second Circuit vacated the sentence, finding *Apprendi* inapplicable. *See United States v. Norris,* 281 F.3d 357 (2d Cir.2002) (*"Norris II"*). It remanded for resentencing.

After a hearing, this court resentenced Norris to 121 months' incarceration. This Memorandum and Order explains the basis the sentence.

### II. *Factual Background*

On June 17, 1999, Norris contacted a confidential informant ("CI") and stated that he was interested in purchasing 10 kilograms of cocaine. *See* Letter of Assistant U.S. Attorney Thomas R. Fallati, May 13, 2003, at 1. The CI stated that he could supply the cocaine for $18,000 per kilogram. Norris and the CI met two days

later while agents conducted surveillance. *See id.* at 1. At the meeting, Norris told the CI that he wanted to buy five or six kilograms of cocaine and would contact him when he had assembled the funds. *See id.* at 1.

The CI and Norris met again on June 23. At the meeting, which was again under surveillance, Norris told the CI that he would be picking up the money to buy the cocaine that night and would have enough cash to purchase five kilograms of cocaine. The CI offered to sell the sixth kilogram on credit. · *See id.* at 1–2.

On June 25, the CI arrived at Norris's house. He was greeted by Michael Mitchell, who led the CI into the kitchen on the first floor. There, the CI was introduced to Irvin Hall. The four men sat at a table while Norris, Mitchell, and Hall counted the purchase money. Purportedly to retrieve the cocaine, the CI then went outside. The police entered the house, and arrested the three men. Agents seized $115,000 in currency; a protective sweep revealed ammunition. Norris told the agents that he owned a firearm. They recovered a loaded .38 caliber firearm in a stand in the bedroom on the second floor. *See id.* at 2.

Hall made post-arrest statements to the effect that on three prior occasions he had assisted Norris by counting money for cocaine purchases. *See Norris I*, 143 F.Supp.2d at 245. He estimated that he counted about $60,000 on the first occasion; $90,000 on the second occasion; and $100,000 on the third occasion. *See id.* at 245. These incidents were not alleged in Norris's indictment and occurred sometime prior to his June arrest.

On October 6, 1999, Norris pled guilty to conspiring to distribute five or more kilograms of cocaine in violation of Title 21, United States Code, section 846. *See id.* at 2. During the plea, he indicated that he

was satisfied with his legal representation. *See id.* at 2–3.

On March 9, 2000, while out on bond, Norris allegedly killed his estranged wife in the presence of their young daughter in a dispute over the purchase of shoes. He was arrested and charged in state court with intentional murder.

Norris was set to be sentenced pursuant to his guilty plea in the drug case prior to the state murder trial. The government asked the trial judge to consider three sentencing enhancements: a two-point enhancement to reflect Norris's involvement with 20.27 kilograms of cocaine (the calculation is explained *infra* ); a two-point enhancement for the possession of a firearm; and a two-point enhancement because Norris supervised his accomplices.

The trial court refused to consider the proposed enhancements. It held that the Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), required that "all facts exposing the defendant to a particular sentence range must be included in the indictment and found by a jury to have been proven beyond a reasonable doubt." *Norris I*, at 249. Norris had pled guilty to conspiring to distribute five or more kilograms of cocaine. *See* Transcript of Plea, Oct. 6, 1999, at 8. During his plea, he stated that he was attempting to purchase nine kilograms of cocaine. *See id.* at 18. He did not allocute to possessing a firearm, supervising associates, or conspiring to distribute 20.27 kilograms of cocaine. Because these three facts were neither allocuted to during the plea nor proven beyond a reasonable doubt, the trial judge refused to consider them in determining Norris's sentence. *See Norris I*, 143 F.Supp.2d at 249.

The trial court found that the base offense level for the crime to which Norris

had pled was 32. *See id.* at 245. .It subtracted three offense levels for his acceptance of responsibility, yielding an adjusted offense level of 29. *See id.* at 245. Norris had three prior convictions for harassing his estranged wife, putting him in criminal history category II. That calculation led to a Guidelines range of 97–121 months. The statutory minimum sentence was ten years. On May 11, 2001, the trial judge sentenced Norris to the mandatory minimum period of incarceration—120 months. Judgement was entered on June 22, 2001. The government appealed.

On January 17, 2002, while the federal sentence was on appeal, Norris was convicted in Queens County Supreme Court of murder. He was sentenced to a term of twenty years to life.

One month later, the Court of Appeals for the Second Circuit vacated defendant's federal sentence. It held, *inter alia*, that *Apprendi* did not apply to enhancements that determine a sentence that is within the applicable statutory maximum. *Norris II*, 281 F.3d at 359. Here, the statutory maximum sentence is life imprisonment. *See* 21 U.S.C. § 841(b)(1)(A). Consequently, *Apprendi* does not apply to the enhancements sought by the government. *See Norris II*, 281 F.3d at 361. The court of appeals also reaffirmed that the proper standard of proof when considering enhancements is a preponderance of the evidence, not clear and convincing evidence as Norris claimed. *See id.* at 361–62. It remanded the case "so that the District Judge to whom the remand is assigned can proceed with the fact-finding contemplated by the Guidelines" and conduct a "resentencing consistent with this opinion" *Id.* at 361, 362. The mandate was issued on July 10, 2002.

Upon the district court's request, the Probation Department then prepared an addendum to Norris's Presentence Report ("PSR"). The revised PSR recommended that the resentencing court take cognizance of Norris's intervening murder conviction. Doing so would move him from criminal history category II to III and would eliminate the three-point reduction in offense level for acceptance of responsibility.

On April 28, 2003, more than three-and-a-half years after pleading guilty, Norris moved to withdraw his plea, alleging that his prior counsel had been ineffective in advising him to plead guilty. She submitted an affidavit in response to the motion stating that while she believed that Norris had a non-frivolous basis for bringing a suppression motion, the government would likely convict at trial even if the results of the search were suppressed. She also stated that she had told Norris that if he wished to cooperate with the government, he would have to forego a suppression motion and plead guilty. Based on the motion's lack of merit, the court denied Norris's motion on May 15, 2003.

On July 31, 2003, Norris was sentenced to 121 months' incarceration.

### III. *Analysis*

#### A. The Feeney Amendment

On April 30, 2003, President Bush signed Public Law 108–21, including the so-called "Feeney Amendment." It was in effect and binding at the time of resentencing. *Cf. United States v. Greer,* 285 F.3d 158, 180–81 (2d Cir.2002) (defendants should be resentenced under the law in effect at the time of the resentencing). The Feeney Amendment added subsection (g) to section 3742 of Title 18 of the United States Code. Subsection (g)(1) requires a resentencing court to apply the Sentencing Guidelines in effect on the date of the original sentencing. Subsection (g)(2) prohibits courts sentencing a defendant on

remand from imposing a sentence outside the Guidelines range unless the ground was specifically raised (in writing) at the original sentencing or was held by the court of appeals to be a permissible ground of departure. Because the original sentencing judge did not grant a departure at the original sentencing and the court of appeals's mandate does not contemplate one, this court appears to be prohibited from considering a downward departure.

## B. Nature of the Mandate

■ Fundamentally, there are two ways to conceptualize the mandate. One is as a limited mandate. If the mandate is a limited one, this court's duty is merely to correct that portion of the sentence that the court of appeals vacated—*i.e.*, the refusal to consider the three two-point enhancements sought by the government. A limited mandate would preclude this court from considering whether the intervening murder conviction should raise Norris's criminal history category or affect the three-point reduction he originally received for acceptance of responsibility.

The other way to analyze the mandate is as a general sentencing mandate—a so-called "clean slate" resentence. If the mandate is a general one, this court's duty would be to conduct a *de novo* sentencing. The Feeney Amendment narrows the scope of *de novo* sentencing somewhat by requiring that courts sentencing defendants on remand not consider departures from the Guidelines unless the ground for departure was raised at the original sentencing or was approved by the court of appeals in the remand. If the trial court conducts a *de novo* sentencing, it would need to take into account Norris's intervening murder conviction. This conviction would: (1) change his criminal history category from II to III; and (2) potentially preclude Norris from gaining a reduction

in offense level for acceptance of responsibility. The net effect would increase his sentencing range to 151 to 365 months, instead of 97 to 235 months, the range under a limited mandate.

The Court of Appeals for the Second Circuit has held that to determine whether a mandate is limited or general, courts must "look to both the specific dictates of the remand order as well as the broader 'spirit of the mandate.'" *United States v. Quintieri*, 306 F.3d 1217, 1227 (2d Cir. 2002). Here, both the specific language of the mandate and its "spirit" indicate that the Second Circuit intended a limited mandate since the error in the first sentence was improperly applying *Apprendi*, not in making any other mistake.

At the resentencing hearing, the government argued that the *Norris II* court vacated *Norris I* "without any indication at all that it was in any way limiting the scope of the sentencing to the issues [ . . . ] that were raised at the time of the original sentence." July 31, 2003 Sentencing Transcript ("S.Tr."), at 16. According to the government, the court of appeals's silence should be construed as permitting a *de novo* sentencing.

■ Such an argument directly contradicts the court of appeals's admonition that a silent mandate should be read as a limited one:

> [A]bsent explicit language in the mandate to the contrary, resentencing should be limited [to issues specified in the Court of Appeals's mandate] when the Court of Appeals upholds the underlying convictions but determines that a *sentence* has been erroneously imposed and remands to correct that error.

*United States v. Carpenter*, 320 F.3d 334, 340–41 (2d Cir.2003) (quoting *Quintieri*, 306 F.3d at 1228 (emphasis in original)). In *Norris II*, as in *Quintieri*, the court

upheld Norris's conviction but vacated the sentence.

An examination of *Norris II* reveals that, far from being silent, the Second Circuit specifically contemplated a limited resentencing. It held that remand was necessary "so that the District Judge [ . . . ] can proceed with the fact-finding contemplated by the Guidelines." *Norris II,* 281 F.3d at 361. The purpose of the remand was for the district court to correct the original sentence, not to sentence the defendant *de novo:* "the case is remanded for resentencing consistent with this opinion." *Id.* at 362.

## C. Acceptance of Responsibility

■ The government contends that, based on the murder conviction, Norris should not be given a three-point reduction in offense level of acceptance of responsibility. Specifically, it argues that according to section 3E1.1, Application Note 3, of the Guidelines, a defendant who enters a guilty plea is not entitled to an adjustment as a matter of right. Application Note 3 also notes that a guilty plea and admission of the conduct comprising the offense may be outweighed by conduct of the defendant that is inconsistent with an acceptance of responsibility. Application Note 1 provides a non-exhaustive list of factors to be considered by a court in determining whether to grant a reduction in offense level for the acceptance of responsibility. The factors include the defendant's "voluntary termination or withdrawal from criminal conduct" and "post-offense rehabilitative efforts."

In light of the limited mandate, the government's argument must be rejected. The court of appeals remanded the case solely so that the district court could evaluate whether the three two-point enhancements were applicable. The intervening murder does not vitiate the fact that by pleading guilty, Norris accepted responsibility for the federal drug offense. The original sentencing judge was aware of the fact that Norris had been arrested for (and had confessed to) killing his estranged wife at the time of sentencing and nonetheless permitted a three-level reduction in offense level.

## D. Criminal History Category

■ For the same reason, the court utilizes the criminal history category employed by the original sentencing judge when he sentenced Norris. His criminal history category is II (reflecting three prior convictions for harassing his estranged wife), not III (were the murder conviction to be considered).

## E. Enhancements

### 1. Cocaine Quantity (U.S.S.G. § 2D1.1(c))

■ Norris pled guilty to conspiracy to distribute and possess with intent to distribute five or more kilograms of cocaine. The government sought to enhance the offense level by two points to reflect Norris's involvement with 20.27 kilograms of cocaine. The cocaine quantity enhancement was calculated as follows: the $115,000 found in Norris's residence was added to the $250,000 that Hall said he had previously counted in connection with other drug transactions. The sum, $365,000, was then divided by $18,000, the per kilogram price agreed upon by Norris and the CI. That calculation yielded a total of slightly more than 20.27 kilograms of cocaine.

Neither Norris's present nor former counsel contested the application of a two-point enhancement for the quantity of cocaine. *See* Letter of Lawrence Gerzog, July 22, 2003; Letter of Mildred Whalen, Nov. 22, 2002. Based on this fact, and on

the information contained in the PSR, the court is satisfied that Norris was involved in a single conspiracy to distribute approximately 20.27 kilograms of cocaine.

### 2. Possession of a Firearm (U.S.S.G. § 2D1.1(b)(1))

■ The original presentence report recommended a two-point enhancement because Norris had a stolen and loaded .38 caliber handgun on a shelf in the upstairs bedroom. The gun was stolen. Some three months prior to Norris's arrest, the Criminal Court in Queens, New York issued an order of protection against Norris to stay away from his estranged wife. The order also prohibited Norris from possessing and/or purchasing a firearm. *See* PSR at ¶ 13, 19.

Application Note 3 to U.S.S.G. § 2D1.1 states that the firearm enhancement should be applied if the weapon was present unless it is "clearly improbable that the weapon was connected with the offense." A two-point enhancement is appropriate if the government can show by a preponderance of the evidence that Norris possessed a firearm in connection with the offense.

This court conducted an evidentiary hearing to determine whether the firearm was possessed in connection with the offense. Norris gave the following explanation for the presence of the gun:

> I had the gun in the house if somebody broke in. I built the house from scratch. It has a big lot connected to the side of the house and people have tried to break in on two occasions. As far as what was taking place that day, it had nothing to do with that and it was downstairs. It was upstairs in a room besides my bed with big patio doors.

S. Tr., at 10–11. The government did not cross-examine Norris nor did it call any witness to rebut Norris's account.

The gun was not found in proximity to the location of the drug transaction. It was in an upstairs bedroom near the dresser. Norris's explanation for his possession of a gun is credible. It is "clearly improbable" that the gun was possessed in connection with the offense. The court so finds.

### 3. Organizer Enhancement (U.S.S.G. § 3B1.1(c))

■ The original PSR recommended a two-point enhancement because Norris had a supervisory role. According to the PSR, Norris supervised the activities of Irvin Hall and Michael Mitchell. *See* PSR at ¶ 14. At the resentencing, the government added that Norris negotiated the transaction and made repeated calls to the CI. *See* S. Tr., at 14.

Defense counsel explained that Norris, Hall, and Mitchell operated in the same way a "law firm works with separate partners." *Id.* at 12. He added, "It is like a lawyer bringing in a client and then all the partners of the firm working on the matter and sharing in the proceeds." *Id.* at 12. Norris, Hall, and Mitchell were "coequals" and Norris "had no responsibility for ordering them to do any particular task." *Id.* at 12. At the time of the offense, Norris was 35 or 36 years old; Mitchell was 32 and Hall about 30 years old. *See id.* at 13. According to Norris, the three men had been doing business for a few weeks. *See id.* at 13. He also claimed that both Hall and Mitchell had more drug dealing experience than he. *See id.* at 13.

The government has failed to prove by a preponderance of the evidence that Norris was an "organizer, leader, manager, or supervisor" as required in order to merit a two-point increase in offense level. *See* U.S.S.G. § 3B1.1(c). Although Norris did negotiate drug prices with the CI, that

alone does not merit the enhancement. *See id.,* Application Note 4 ("This adjustment does not apply to a defendant who merely suggests committing the offense.").

F. Concurrent versus Consecutive Sentences

■ Norris is presently 43 years old, and has seventeen more years to serve on his state conviction. As the government conceded, the court may in its discretion order the federal sentence to be served concurrently, partially concurrently, or consecutively with the state sentence. *See* S. Tr., at 20; U.S.S.G. § 5G1.3(c).

At the resentencing hearing, the government urged the court to order the sentences to run consecutively. If the sentences were ordered to run concurrently, the government asserted, "the defendant is not going to be penalized for his narcotics conduct here." S, Tr., at 21. This court disagrees. The present conviction will be considered by the state parole board in seventeen years. As the court noted, because "the State of New York is not known for its leniency towards murderers and drug sellers," Norris is "liable to stay in state prison for the rest of his life." *Id.* at 21–22. The court finds that a concurrent sentence best achieves a "reasonable punishment for the instant offense." as required by the Guidelines. U.S.S.G. § 5G1.3(c).

G. Calculation

The final calculation of Norris's sentence is as follows. The base offense level is 32. *See* U.S.S.G. § 2D1.1(c). Two points are added for drug quantity; three are subtracted for acceptance of responsibility. This yields an adjusted offense level of 31. The relevant criminal history category is II. This yields a Guideline range of 121–151 months' imprisonment. The statutory minimum sentence is ten years' imprisonment.

IV. *Conclusion*

Instead of the original sentence of 120 months, Norris is sentenced to 121 months' imprisonment to run concurrently with the State sentence. Three years of supervised release subject to the conditions set forth orally on the record and a $100 special assessment are imposed.

SO ORDERED.